PHILIP FREEMAN CO., INC. *v.* UNITED STATES

No. 4473.—Invoices dated Smrzovka, Czechoslovakia, July 18, 1935; Morchenstern, Czechoslovakia, February 1, 1936.
Certified July 19, 1935; February 3, 1936.
Entered at New York August 5, 1935; February 21, 1936.
Entry Nos. 3444, 24512.

(Decided December 13, 1938)

*Sharretts & Hillis* (*Arthur Tallman* of counsel) for the plaintiff.
*Webster J. Oliver,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the defendant.

SULLIVAN, Judge: In these reappraisements the merchandise consists of certain illuminating glassware, termed U-drops and prisms, imported into the United States by Philip Freeman Co., Inc., who had purchased the same from Peter Bobek of Czechoslovakia. Counsel have stipulated orally in open court "that the proper basis for assessment of duty is export value."

According to the notices to importer of advance in value upon appraisement, in 113101–A "the appraised value exceeds the entered value by 30 percent, and in 113102–A, by 21 percent."

The plaintiff contends that the invoiced and entered value is the correct export value.

Reappraisement 113101–A involves 40,000 "U-Drops," items 185/3″ 1a, exported from Smrzovka, Czechoslovakia, on July 19, 1935, entered at a unit value of 28 crowns per 100, less 5 per centum cash discount, and less freight to Hamburg, and appraised at export market value 38 crowns per 100, less 10 per centum discount, f. o. b. Hamburg, packing included.

Reappraisement 113102–A involves 20,000 of the same U-drops, also 7,000 "X-Prisms 4″, 1a," exported from Morchenstern, Czechoslovakia, February 3, 1936. The 20,000 U-drops were entered at a unit value of 30 crowns per 100, less 5 per centum discount, less freight to Hamburg, and appraised at 38 crowns per 100, less 10 per centum discount, f. o. b. packed, export value. The 7,000 X-prisms were entered at 62 crowns per 100, less 5 per centum discount, less freight to Hamburg, and appraised at 75 crowns per 100, less 10 per centum discount, f. o. b. packed, export value.

Plaintiff's witness Freeman testified he is the president of the plaintiff corporation, and familiar with the merchandise in question; that the merchandise was purchased from P. Bobek located in Morchenstern, Czechoslovakia.

Samples of the U-drops, 185/3″ 1a, were received in evidence as Exhibit 1.

The witness testified he paid for the U-drops covered by reappraisement 113101–A, 28 crowns per 100, being the invoice value paid to the manufacturer; that he was allowed 5 per centum for cash; and paid cash in all his transactions with the manufacturer; that in reappraisement 113102–A he paid cash for the U-drops represented by Exhibit 1, 30 crowns per 100, and was allowed a discount of 5 per centum for cash.

A sample of the item invoiced as "X Prisms 4″" was not introduced. It was testified the U-drops and prisms are practically the same articles; that all are prisms used for the same purposes; that he paid 62 crowns per 100 for the X-prisms in cash, receiving a 5 per centum cash discount; that between the first purchase of U-drops and the second the price increased, which accounts for the higher price of the U-drops in reappraisement 113102–A; that up to October 25, 1935, the price of the 185/3″ 1a prism was quoted at 28 crowns per 100, and the price was raised to 30 crowns in June 1936; that in November 1936, the price again dropped to 28 crowns; that there are other manufacturers in Czechoslovakia, who make articles like Exhibit 1 and the 4-inch prisms, located in towns like Morchenstern and Gablonz within twenty to forty miles of each other, and that he knows such manufacturers, who are all located within that district; that he makes all his purchases in the Gablonz district; that he ascertained a wholesale quantity of the U-drops to be between 30,000 and 50,000, and of the 4-inch prisms, "between 5 and 10 thousand"; that in the year 1935 he had offers from other manufacturers and jobbers of U-drops and prisms, one being from Richard Korber of Gablonz and another from Robert Richter of Morchenstern; that Mr. Korber is a jobber, who has made offers on his own account, which probably included his profit; that Korber's merchandise was similar to Exhibit 1; that witness received a letter from Robert Richter, dated October 16, 1935, offering to sell these U-drops, wood-polished, at 32 crowns per 100. A sample of Richter's merchandise was received in evidence as Illustrative Exhibit A, and the letter from him as Illustrative Exhibit B. Exhibit B is in German. The witness translated the portion of it having reference to this merchandise, as follows:

In answer to your cable, the lowest price for 20 cases of 3-inch, wood polish, is 32 crowns.

The witness testified that the U-drop he imported, Exhibit 1, is a lighter one than that submitted by Robert Richter, Exhibit A, and is somewhat inferior thereto, which accounts for its higher price.

A pricelist on a letterhead of Richard Korber, Gablonz, dated December 6, 1935, was received in evidence as Exhibit 2. It is in

German, and the court does not find a translation thereof among the papers.

The witness, in translating portions of Exhibit 2, stated that the price quoted for U-drops crystal, No. 50938, wood-polish was "Kc. 31 per 100," which is exactly the same merchandise as that in question; and that for the 4-inch prism, known as 50924/4″, "4-inch crystal," Korber's quotation is "66 crowns per 100," and those prices are subject to "a cash discount of 5 per cent, and 3 per cent for the buyer"; that this merchandise is exactly similar to that at bar.

There was received in evidence as Exhibit 3, the affidavit of P. Bobek, the manufacturer and seller of the merchandise covered by the two reappraisements at bar. He states he has been manufacturing and selling glass articles for the past forty years, and was manufacturing and selling glass U-drops and prisms during the year 1935 and up to the present date (April 25, 1938); that Morchenstern, Czechoslovakia, is the principal market for the sale of glass prisms and U-drops and the principal manufacturers are located there; that sales of glass U-drops and prisms in Czechoslovakia are mostly for exportation to other countries; that the usual wholesale quantity of glass U-drops is 30,000 and sales of 30,000 are more frequently made than any other quantity; that in the case of glass prisms the usual wholesale quantity is 10,000. He continues as follows:

The number of sales of glass U-drops and prisms for the home consumption in CSR, are small in comparison with the number of sales for exportation, but the prices obtained by me for the usual wholesale quantities sold for home consumption are the same or lower than the prices received for sales for exportation to other countries. This was true during the year 1935 and up to the present date.

Referring to the invoice with protest 113101–A, #8985, he states that the glass U-drops #185/3″ 1A were sold by him to Philip Freeman Co., Inc., "at 28 CS. Kr. per one hundred." These are the U-drops under reappraisement, and the price is that stated in the invoice referred to.

As to consular invoice 1485 covered by reappraisement 113102–A, he stated that the merchandise was sold to Philip Freeman Co., Inc., at the following prices:

U-drops 185/s″ 1a at CS. Kr. 30 per 100; X prisms 4″ 1a at 62 CS. Kr. per 100. * * *

At the time of the above sales, I was freely offering the articles named in the usual wholesale quantities in the ordinary course of my business to anyone who wished to buy at the same prices paid by Philip Freeman Co., Inc., of New York, and under the same terms.

Due to changes in the raw material market, labor conditions, taxation, and other overhead expenses, the wholesale prices of the U-drops were changed several times from the year 1935 to date.

He then gives particulars as to the fluctuations in the prices of U-drops during 1935 and 1936, and states:

During the periods above set forth, I was freely offering the articles named in the usual wholesale quantities at the prices specified to all purchasers whether for domestic consumption or for export.

Any sales made by me at prices higher than those prevailing at the time were either in less than the usual wholesale quantities or made on a long credit basis. Such sales are infrequent and are not in the usual course of my business.

*In the ordinary course of my business where the usual wholesale quantities are purchased and prompt payment made, my prices to all purchasers were the same as those paid by Philip Freeman Co. Inc., of New York.* [Italics mine.]

Three invoices are attached of sales to domestic firms. The first, dated December 14, 1936, covers, among other things, a sale of 2,500 X-prisms, 4″, 1a at 61 crowns per 100 with discounts of 2 and 1½ per centum; the second, dated August 8, 1936, a sale of 1,000 "U Birnel 185/3′″" at 29 crowns per 100, net; and the third, dated October 30, 1936, a sale of 10,000 "U Birnel 185/3″ 1a," at 32.50 crowns with discount of 1½ per centum. These invoices of domestic prices compare with prices on the invoices in question for U-drops 185/3″ in quantities of 20,000, of 30 Czechoslovakian crowns on the invoice of February 3, 1936, and in quantities of 40,000 at 28 Czechoslovakian crowns per 100, on the invoice July 18, 1935, less a discount of 5 per centum in each case.

As to the "X-Prisms 4″ 1a" the above price of 61 crowns per 100 with discounts of 2 and 1½ per centum compares with the price on the invoice with reappraisement 113102–A of 62 Czechoslovakian crowns, less discount of 5 per centum.

It will be observed that these domestic sales appear to be in less than the usual wholesale quantities stated in the affidavit, Exhibit 3.

The defendant called as a witness Ralph I. Esterich, who testified he is "Clerk and examiner in Mr. Masterson's office." Referring to the reappraisements in question he testified:

I looked them both over. On the second one, exported on February 3, 1936 (No. 113102–A), I wrote out the complete appraisal on this here, as denoted by my figures.

He further testified he looked at the merchandise in both reappraisements, and on 113101–A he brought the merchandise to examiner Masterson and showed him the report, and the comparable merchanised, and he wrote the figures on the invoice, and made the appraisement on both, "but on the second one, 113102–A, I put the figures on the invoice and he checked it, as he did with the first one."

An invoice was received in evidence covering U-drops 185/3″ 1a, which the witness testified was identical merchandise with that under reappraisement, wherein the witness testified "the terms of purchase were 38 crowns per 100, less 10 percent, f. o. b. Hamburg, packed." This invoice is dated July 29, 1935, and was received in evidence as

Exhibit 6. Among other things it covers 10,000 U-drops 185/3″ 1a at 38 crowns per 100, less 10 per centum discount. It is made to the Cambridge Glass Co., Cambridge, Ohio. The seller is Peter Bobek, Morchenstern. The invoice was marked Exhibit 6.

The witness was shown the papers in entry 746092. He testified the merchandise covered thereby came under the jurisdiction of Mr. Masterson; that the witness looked at the merchandise on the floor, and, after verifying the quantities and samples thereof, showed the invoice to Mr. Masterson, took out the record of Philip Freeman's purchases, and the witness and the examiner made a comparison; that the merchandise was the same.

The invoice covered by that entry was from Peter Bobek to Cambridge Glass Co. This invoice is dated September 24, 1935. The witness testified that this merchandise is the same as the merchandise under reappraisement, and that the terms of purchase were on "the 4″ X-prisms, 75 crowns per 100, less 10 percent, f. o. b. Hamburg, packed." He did not know the credit terms, and plaintiff's counsel objected to the entry on this ground. The objection was overruled, and the entry was received in evidence as Exhibit 7. The invoice value of the prisms at bar is stated in reappraisement 113102-A as 62 crowns per 100, less 5 per centum discount.

Several entries were received in evidence as Exhibit 8. The witness testified that the merchandise covered thereby is the same as that before the court. As to Collective Exhibit 8, plaintiff's counsel stated:

I will concede his testimony with regard to these would be the same as with regard to the two he already testified to.

It will be observed that Mr. Masterson did not testify personally for the reason he was absent on account of illness.

The Government introduced in evidence a special agent's report, Exhibit 4, dated at Vienna, Austria, on December 4, 1935, relating to merchandise from Peter Bobek of Morchenstern, Czechoslovakia, like that in question. He states that on November 6, 1935, he visited the office of Peter Bobek at Morchenstern, and obtained the information contained therein; that the only relationship between the importer and the manufacturer is that of buyer and seller, and that the manufacturer is free to offer and sell this merchandise to any purchaser.

The special agent states that consular invoice 7440 was checked against the commercial invoice and order of May 11, 1935, and found to agree. Consular invoice 7440 is not one of those covered by these reappraisements. The date May 11, 1935, is nearly two months prior to the date of the invoice in reappraisement 113101-A, and nearly nine months prior to the date of the invoice in 113102-A.

As to prices the special agent states:

Prices are negotiated and no lists are issued. Philip Freeman & Bro. receive better prices for large quantities, frequent orders, and prompt payment against letter of credit than Cambridge Glass Co. who purchase comparatively small quantities of quality I only and pay on open account.

\*       \*       \*       \*       \*       \*       \*

Freeman and Brother receive a discount of 5%.

This company's other American customer, Cambridge Glass Co., Cambridge, Ohio, receives a discount of 10%.

The special agent gives "copies of sales of this merchandise" to Philip Freeman & Bro. and states a price of 28 crowns per 100 for 185/3'' I, on July 18, 1935, August 10, 1935, September 12 and 24, 1935, and October 12, 1935, in lots of from 21,000 to 50,000 pieces.

It will be observed that the first sale stated by the special agent is that of July 18, 1935, for 40,000 pieces at a price of 28 crowns per 100. This is evidently the invoice covered by reappraisement 113101–A, where the price is the same as that stated by the special agent.

The special agent also refers to a sale to Freeman on October 24, 1935, of 20,000 pieces of 185/3'' I at 30 crowns per 100. This is the same price for this item stated in the invoice dated February 1, 1936, in reappraisement 113102–A.

All the sales listed by the special agent to Freeman are stated by him to be "f. o. b. Hamburg packed, less 5% discount."

The special agent sets out four sales to the Cambridge Glass Co. in 1935 on May 31, July 8 and 29, and October 31, each for 10,000 pieces of No. 185/3'' I, at 38 crowns per 100 pieces, f. o. b. Hamburg packed, less 10 per centum discount.

The special agent states that the usual wholesale quantity for export of this merchandise is "10,000 pieces and over, per quality," and in the home market "Up to 10,000 pieces per quality"; that the usual turnover tax of ¾ per centum is included in the export price.

The special agent mentions two sales in the home market of 185/3'' I, viz:

Aug. 20, 1935, 5,000 pieces 185/3'' 1, purchased by J. W. Jaeckel, Wisenthal, at Kc. 27.00 per 100.

Aug. 29, 1935, 2,000 pieces 185/3'' 1, purchased by Ad. Schoenbeck, Morchenstern, at Kc. 27.00 per 100.

The terms of both of the above sales in the home market were "delivered loose, less 2 per centum cash, less 1½ per centum turnover tax discount."

It will be seen from the above examples that the wholesale quantity is considerably less in the home market for 185/3'' I than for export, and in addition that the price is lower.

The special agent states that the principal market for this merchandise is in Gablonz, Czechoslovakia.

As to turnover tax and discounts the special agent states:

This manufacturer, because located at Morchenstern within the Gablonz district, is subjected to the "Pauschal" (lump-sum) turnover tax of ¾% assessed on his turnover and included in the price of all sales made by him.

On sales made within the Gablonz district there is deducted the usual 1½% turnover tax discount from which the buyer pays the ¾% "Pauschal" turnover tax for the manufacturer.

This manufacturer claims that if such or similar merchandise is sold for home consumption in Czechoslovakia outside the Gablonz district, the regular ¾% turnover tax would apply. * * *

This report is entirely with reference to the U-drops and does not relate to the X-prisms 4″ at all.

This closed the evidence in the case.

There is some conflict as to what constitutes a usual wholesale quantity. Mr. Freeman states that the usual wholesale quantity of the U-drops is between 30,000 and 50,000, and of the 4-inch prisms, between 5,000 and 10,000.

Mr. Bobek states that the usual wholesale quantity of the U-drops is 30,000, and of the prisms 10,000.

The special agent states that the usual wholesale quantity of the U-drops for export is 10,000 pieces and over, and in the home market "up to 10,000 pieces per quality."

There is some contradiction in the testimony, but I am of the opinion that the testimony of Mr. Freeman, supported as it is by the sworn affidavit of Mr. Bobek, is entitled to greater weight than the evidence introduced by the defendant, and particularly the special agent's report. Mr. Freeman and Mr. Bobek are conversant with this merchandise, its manufacture, purchase, and sale. The statements in the special agent's report are gathered from conversations and inspections of invoices over a period of time; yet the report does not outweigh the testimony of Mr. Freeman and the affidavit of Mr. Bobek, who are positive as to what constitutes a wholesale quantity, and have placed it in the U-drops at 30,000 pieces and the prisms at 10,000 pieces. In my judgment this testimony is superior to the conclusions contained in the special agent's report, and thereby outweighs it.

It will be noticed that the invoice in 113101–A covers 40,000 of the U-drops. This according to the testimony and affidavit is clearly a wholesale quantity.

In reappraisement 113102–A there are under reappraisement 20,000 U-drops 185/3″ 1a, and 7,000 X-prisms 4″. 20,000 U-drops is less than a usual wholesale quantity; but the invoice in addition covers 20,000 U-drops 185/3″ 11a, not under reappraisement. Therefore the entire invoice covers more than a usual wholesale quantity of U-drops. As to the X-prisms 4″ the weight of the evidence indicates that 7,000 is a wholesale quantity.

As to the U-drops 185/3″ 1a, I think the sales to the Cambridge Glass Co. cannot properly be considered in determining export value for the reason that each sale is below the minimum usual wholesale quantity of 30,000 pieces.

As to the X-prisms, however, the minimum wholesale quantity is 5,000 pieces. The examiner produced invoices of three sales of these prisms of 8,000, 8,000, and 7,000 X-prisms, respectively, to the Cambridge Glass Co. at 75 Czechoslovakian crowns per 100. We think therefore that these invoices indicate that the export value of the prisms is as found by the appraiser.

I therefore find as follows:

(1) That there is an export value for the merchandise at bar, which is higher than the foreign value.

(2) That the principal market in Czechoslovakia for this merchandise is Morchenstern.

(3) That the usual wholesale quantity of the U-drops in question in the ordinary course of trade for export is 30,000 pieces, and of the prisms between 5,000 and 10,000 pieces.

(4) That the export value of the U-drops 185/3″ 1a under reappraisement in the usual wholesale quantities of 30,000 pieces was in reappraisement 113101–A on July 18, 1935, 28 Czechoslovakian crowns per 100; and in reappraisement 113102–A was on February 1, 1936, 30 Czechoslovakian crowns per 100 pieces, less discount of 5 per centum and less freight to Hamburg.

(5) That the export value of the X-prisms 4″ 1a, covered by reappraisement 113102–A was on February 1, 1936, 75 Czechoslovakian crowns per 100 pieces, less 10 per centum, f. o. b. packed.

(6) That the entered value is affirmed as to the U-drops covered by both reappraisements.

(7) That the appraised value is affirmed as to the X-prisms 4″ 1a, covered by reappraisement 113102–A.

Judgment accordingly.